

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

---

## NO. 2-08-014-CV

---

IN THE INTEREST OF M.M.F., J.J.F.,
AND E.F.

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Michael F. appeals the trial court's judgment terminating his parental rights to his three children—Matt, John, and Eric.[2] In ten points, Michael argues that the evidence is factually insufficient to support the trial court's endangering environment and endangering conduct findings, that the evidence is factually insufficient to support the trial court's best interest finding,

---

[1] *See* Tex. R. App. P. 47.4.

[2] Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we use aliases for the names of the children.

that the trial court abused its discretion by denying his motion for continuance, that the trial court committed reversible error when it admitted photographs without proper predicate, and that section 263.405 of the Texas Family Code violates the Due Process Clause, the Equal Protection Clause, and the separation of powers doctrine. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Melisa and Michael are the biological parents of Matt, John, and Eric. At the time of trial, Matt was four, Molly was three,[3] John was two, and Eric was one and a half. Because Melisa did not perfect an appeal from the judgment terminating her parental rights, we limit our discussion of the facts to those that are pertinent to Michael's appeal of the termination of his parental rights.

### A. Previous CPS History

On July 9, 2003, CPS received a referral alleging physical neglect and physical abuse of Matt by Melisa because she was bipolar and was not taking her medication. CPS gave the case a disposition of "reason to believe" and instituted a safety plan, which Michael signed, stating that Melisa would have no unsupervised contact with the child.

---

[3] Molly's father was Kevin H., and he signed an affidavit relinquishing his parental rights to Molly. Molly is not Michael's biological child, so he is not asserting any rights to her. However, because she was in the home, we include her information when it is relevant.

The next referral came in on December 24, 2003, and involved allegations of physical neglect and medical neglect. Michael and Matt were staying at the Salvation Army, and Michael was not cooperative with the program; he appeared volatile and unstable. Matt had an open lesion on his left ankle; hard, cracked skin over his body; and a distended abdomen. CPS ruled out that case.

On May 23, 2005, a referral came in for physical neglect and neglectful supervision of Matt and John by Melisa. The referral came in after Melisa gave birth to John because there was a concern regarding her ability to properly care for him due to her diagnosis of bipolar disorder and her inclination not to take her medication. CPS ruled out that case but left it open for services to be provided through Catholic Charities.

On February 6, 2006, a referral came in for physical neglect of Matt, Molly, and John by Michael and Melisa. The allegations included a dirty kitchen, dirty clothes throughout the home, and John was yellow and had his hands bound with a piece of rag, possibly to keep him from scratching his skin. All three children were seen at Cook Children's Medical Center. Molly and Matt had no problems. John, however, had a skin condition, and his weight was just below the fifth percentile. All three children were sent home with Michael and Melisa, along with a safety plan. CPS ruled the case reason to believe for medical neglect and ruled out the allegations of physical neglect.

3

Even though a case was opened in May 2006 for family based safety services, the Department went a number of months without seeing the children because Michael, Melisa, or both would not allow anyone from the Department to see any of the children. Because Michael and Melisa were not cooperative with CPS and would not allow family, friends,[4] or professionals to enter their home to see their children, the court signed an order providing services for the family on January 30, 2007.

**B.     The February 1, 2007 Psych Call**

Two days later, Shawn Burton, a paramedic with MedStar, received a psych call.[5] He responded to the call and found Melisa[6] in the kitchen working on family scrapbooks. He noticed a child, Eric, in a car seat or carrier on the kitchen counter and three children in the living room. When Burton and another paramedic removed the layers of blankets that were on Eric, they saw that he

---

[4] During the course of CPS's investigation, Melisa's mom said that Michael would not allow her to see Eric, and two people who were interviewed who were close to Michael and Melisa admitted that they had not been permitted to see Eric. The person who reported the family to CPS said that Eric was kept hidden in the bedroom.

[5] A neighbor had initiated the call after attempting to check on the children and being turned away by Melisa.

[6] Although this person is referred to at various points in the record as "Maria," the evidence indicates that this is a mistake and that the correct name is Melisa.

4

was severely malnourished, that he had almost no musculature, that he was very dehydrated, that his eyes were sunken in, that he was covered in eczema, and that his arms had been wrapped behind his back.

The paramedics questioned Melisa about why Eric's arms were secured behind his back, and she said that it was to keep him from scratching. She also told them that Eric had eaten five times that day, and then she took an almost-empty box of dry cereal out of the refrigerator to make her point. However, they did not find anything that would confirm that Eric had eaten during the day, and Melisa was unable to show them any bottles anywhere in the house. They found no food in the cabinets and little to no food in the refrigerator. Burton checked on the three other children, who were all under the age of four, and noted that they were well fed and were playing in the living room.

They explained to Melisa the seriousness of Eric's condition and that they were going to take him to the hospital. They also notified the police to come interview Melisa. Melisa was not cooperative and did not want them to take Eric. She told them that she did not think it was a good idea and that she wanted her husband to make the decision. So they called Michael and explained that they needed to take Eric to the hospital. He, too, was not cooperative at first and told them that he would take Eric to the doctor the next

5

day.  They explained that due to the seriousness of Eric's condition, they "were going to have to take him anyways."  Michael finally agreed.

Burton's partner took Eric to the ambulance and began working on him while they waited for the police to arrive and look after the children because Melisa was agitated and not alert to what was going on.  The neighbors told him that Melisa does not take her medicine.  When he asked Melisa whether she had taken her medicine, she would not answer.

## C.    Eric's Hospitalization

Dr. Jayme Coffman, who was qualified as an expert on child abuse because she is a pediatrician and medical director of the Care Team (the child abuse program at Cook Children's Medical Center), testified that she came into contact with Eric on February 2, 2007, when she was asked to consult on his case.  Eric had been admitted to the pediatric intensive care unit the day before and was severely malnourished.

Dr. Coffman testified that Eric, who was seven and a half months old, weighed 3.8 kilograms or a little over 8 pounds; had no body fat; had a sodium level of 115, which is incompatible with life; and had "severe, severe eczema." Eric was "way off the growth charts, not only on weight, but on length and head size as well" and had been starved long enough for it to affect his length and brain growth.  Dr. Coffman testified that this was not an overnight process

6

that caused Eric's body to quit growing and his brain to atrophy. She further testified that Eric did not have a preexisting medical condition that caused this, that his condition was the result of someone not feeding him, and that his condition was obvious enough that it could be observed with the naked eye. Dr. Coffman said that Eric presented with "the worst case of malnourishment that [she had] seen that survived" and determined that his condition was abuse due to severe malnutrition and starvation.

Dr. Coffman said that Eric was in the hospital a couple of weeks because "when they're that malnourished, it's difficult to refeed them. Their gut is not used to the food, and so it's difficult to get them to eat again, basically, and to absorb the nutrition." So they reintroduced food slowly and diluted it so that his intestines could learn to deal with normal nutrition.

Dr. Coffman testified that at the time of trial, Eric was a typical kid who may have some special educational needs. Her main concern for Eric, based on his brain atrophy, is future learning difficulties or developmental delays. She said that he will need lots of developmental assistance through early childhood and Head Start, but even with that, she was not sure that he could reach the potential that he would have had if he had not been starved. He does not require special living circumstances, only someone who will keep up with

7

appointments and be aggressive in following through to make sure that Eric gets his educational needs met.

Dr. Coffman looked at previous emergency room visits during which one of Eric's older siblings—John—was diagnosed as "failure to thrive [malnourished] with eczema" and noted that Eric's medical records stated that Eric's mother and father were his primary caregivers. Dr. Coffman therefore felt that it was appropriate that CPS remove the children. Dr. Coffman said that she would have concerns if Eric was returned to the caregivers who had allowed him to get into the state he was in.

**D.    The Department's Investigation**

Stephanie Nick, formerly an investigator with the Department, testified that on February 1, 2007, the Department received a referral that alleged medical neglect and physical neglect of Eric by both of his parents. She met with law enforcement and went to the residence, where she met Melisa and her three older children. When Nick arrived at the home, she noticed signs of violence, including that the screen on the front porch had been smashed, that the living room had a broken window, and that there were holes in the walls throughout the home, but Melisa would not permit her to take any photographs.

8

Melisa told Nick that she fed Eric several times a day, that she breastfed him, that he ate Enfamil with iron, and that he also ate baby cereal and jars of baby food. Melisa showed Nick the box of Beachnut baby cereal, a couple of containers of baby food, and an unopened, three-pack of bottles.

Nick also observed the older children while she was at the home and noted that Matt and John exhibited developmental delays. John was in the corner and not playing with the others, and Matt was three and a half and was not potty-trained and said only the word "car." Nick removed the children from the home later that day because Eric, who was seven and a half months old and weighed only eight and a half pounds, had been transported to the hospital. This indicated to Nick that Eric was not being fed appropriately, so she ruled the case as reason to believe for neglectful supervision of Eric, John, Molly, and Matt by both parents and reason to believe for physical neglect and medical neglect of Eric by both parents.

Nick went to the hospital on February 2 to see Eric. At that time, his dry, flaky skin was hanging from his bones.[7] She held him during his diaper changes, and she could see the lymph nodes in his groin. He appeared to be very uncomfortable.

_____

[7] The record included photographs from February 1, 2007, showing Eric's malnourished state.

9

Nick interviewed Michael on February 2, and he said that Melisa has a mental condition and a history of not taking her medications. He said that her medicines were kept in the cabinet and that he "kind of forgot about them." He said that Melisa was responsible for the children during the day while he worked and that he provides care to Eric after he returns home from work in the evenings, during the night, and on the weekends. Michael said that he would feed Eric several times during the evening hours and that he was eating up to eight ounces at a time.[8] Nick asked both Michael and Melisa about how Eric got into the condition he was found in, and both were adamant that they had been feeding him on a regular basis.

Michael told Nick that he wanted a home study performed on Melisa's parents. When Nick met with Melisa's dad, he told Nick that he suspected domestic violence between Melisa and Michael and that an altercation had occurred between Michael and Melisa's mom. Nick also learned during the interview with Melisa's dad that he had been in the home approximately twice a week to pick up Molly. Melisa's dad said that when he had seen Eric the last weekend in January, he was covered in blankets, but his face was thin. Melisa's dad told Nick that he had seen both Michael and Melisa feed Eric cereal

---

[8] The medical records also stated that Michael reported that he fed Eric the previous night and that he took the whole bottle.

and baby food. However, it concerned Nick that Melisa's dad knew of his daughter's mental health issues and her propensity to not take her medicine, that he was in the home on a regular basis, and that he did not report Eric's looking thin.

During Nick's investigation, she discovered that this family had an extensive history with CPS. She requested a criminal history, and what she learned about Michael factored into the reasons for the removal of the children.[9] Nick felt that removal of the children was appropriate because the family had not been cooperative in the past and because she had very serious concerns about the parents' present ability to care for and protect their children. The Department felt that removal of all four children from Michael and Melisa was in the children's best interest.

### E.    The Caseworker's Observations

Christie Weaver, the ongoing caseworker for the children in this case, testified that she met with Melisa. During the meeting, Melisa threatened to beat her up, and the children behaved timidly around her, though Weaver never saw her strike at them.

---

[9] Nick said that a criminal case is being investigated but that charges had not been filed at the time of the termination trial.

Weaver also met with Michael, and gave him a service plan. He completed his psychological evaluation, which diagnosed him as having an adjustment disorder. The psychological evaluation recommended that Michael enroll in individual supportive counseling for adjustment issues, that he participate in parenting class, that he enroll in GED classes, and that his probation officer be contacted for treatment plan purposes.[10] Michael did subsequently obtain a certificate for completing parenting classes. He failed, however, to complete his service plan because he did not undergo a psychiatric evaluation, participate in individual and family counseling, or submit to a drug test.[11]

Michael visited regularly with the children and missed only three or four visits. Weaver noted that there were several occasions when Michael did not engage the children and when he would read a magazine during the visit. At one visit, he pushed John away and told him to go bother someone else. During a visit in July 2007, he threatened to spank John and reached down as

[10] Weaver testified that her understanding was that Michael was on probation during this case for an aggravated assault charge from a prior year. However, the record reflected that Michael was placed on deferred adjudication for criminal mischief and that there was a plea in bar on aggravated assault.

[11] On the day that Weaver asked Michael to take a drug test, she had concerns because his behavior was considerably different than it had been in the past, and she wanted to rule out substance abuse.

though he were taking off his belt. Later during the visit, Michael became agitated when Matt and John started throwing balls at him, and he took their hands and squeezed them. Weaver described the rest of the visit as follows:

> And then after -- after about 30 minutes in the visit, [Michael] took a toy away from [Matt] and [Matt] teased [Michael] saying, "I got the toy. I got the toy." And [Michael] took the toy away from him and he glared at [Matt] and [Matt] yelled at his father three times to shut up, each time getting louder.
>
> And [John] said something to [Matt] and [Michael] said, "You tell him, Son." And [Matt] then looked at his father and called him a fucker. And at that point [Michael] reached out and grabbed [Matt] by the shirt and jerked him towards him. And at that point I interrupted the visit and asked [Michael] to leave.

After that visit, CPS took precautions to have two observers and to have a male caseworker in the hallway or in the adjacent rooms every time that Michael visited. Additionally, after a bonding assessment was completed, the visits were reduced to once a month due to Michael's behaviors, the chaos that they created with the children, and the after-effects on the children following visits with Michael.

Currently, Matt and Molly are together in a foster home, and John and Eric are together in another foster home. Both Molly and Matt were nonverbal when they came into care, and now they are able to communicate effectively. Molly has been potty-trained, and Matt is attending Head Start, where he is

13

learning his ABCs. The one concern noted in Matt's service plan was that he had shown possible signs of sexual abuse.

Eric and John are progressing more slowly. Eric went from a little over eight pounds in February 2007 to twenty-four pounds at his birthday in June 2007. Eric is in occupational therapy and works with Early Childhood Intervention. Eric is seeing a doctor regularly to relearn how to use the muscles that allow him to swallow. Due to Eric's swallowing problems, his food has to be prepared so that he will not aspirate or choke on what he eats or drinks.

Like Eric, John has shown signs of severe neglect. Generally, John is fairly quiet and reserved. However, he can be extremely aggressive and violent and has directed that behavior toward Eric and other children. Weaver testified that, in her opinion, John has serious emotional problems. John has been diagnosed with reactive attachment disorder, which is a life-long disorder, and he is in therapy with a therapist at the University of North Texas. John was also diagnosed with post-traumatic stress disorder and struggles with attachment issues in that he attaches to inappropriate caregivers, such as people whom he has been with for only fifteen or twenty minutes.

Weaver's concerns for the scenario of returning the children to their parents are that the children will be neglected, that Eric will not be fed, that the children will not be cared for appropriately, and that they will again witness

14

domestic violence in the home. Weaver therefore recommended that the trial court terminate the parental rights of Michael and Melisa and testified that termination was in the children's best interest. Weaver believed it would be good for all four children to be placed together, but the Department's current plan was to place two of the children with one home and the other two children in another home. Weaver asked that the trial court name the Department as the managing conservator of the children. Weaver said that the permanency plan for the children is for them to be adopted.

### F. CASA's Observations and Recommendation

Teresa Schultz, the court appointed special advocate for the children, said that Michael's initial visits with Molly, Matt, and John "didn't go well at all." It appeared that Michael did not know how to interact with the children, so they each stayed by themselves. She described the visits as "torture" and felt that the children suffered when they spent time with Michael because they showed signs of emotional distress. Schultz said that Michael's behavior at the visits improved as time went on. He seemed to apply what he had learned in his parenting classes and seemed to interact better with his children.

Schultz also observed the first visit that Eric was taken to[12] and said that Eric handled it well after some initial timidity. During that visit, Michael interacted with all of the children and gave Eric a bottle and sang or read to him. Michael changed one of Eric's dirty diapers during that visit and also made the caseworkers aware of Molly's issues in going to the restroom.

Schultz recommended terminating the parental rights of all three parents in this case. Schultz said that Molly and Matt are bonded together and that John and Eric are bonded together. Schultz thinks that all four children should be together, but if they cannot be together, the current groupings should be maintained.

## G. The Ad Litem's Recommendation

Sylvia Andrews, the ad litem for the children, recommended that the trial court terminate the parental rights of all three parents, that Melisa's parents be named temporary managing conservators of Molly and Matt, and that John and Eric remain in the foster home where they are currently residing.

---

[12] Eric was not allowed to participate in visitations until he was healthy enough to do so and until his parents started participating in their service plans.

**H.     Trial Court's Disposition**

After hearing the above evidence and reviewing the medical records from

Cook Children's Hospital and MedStar, as well as Melisa's records from John

PeterSmith Hospital, the trial court stated on the record:

> With respect to the evidence of [Michael,] he had some -- had some
> culpability in this matter.  We have the testimony of Shawn Burton
> from MedStar who says when he entered the house that one of the
> things that they did was call [Michael] at work.  He objected to the
> removal of the child by MedStar EMTs.
>
> We have the testimony of the caseworker where [Michael]
> told her that he provided the care for [Eric] every night when he got
> off work and [Eric] drank eight ounces of formula and he had given
> him eight ounces just the night before.
>
> So the long and the short of it is there is every indication the
> -- and -- and we have the evidence that the grandparents had -- had
> been cut out of any real relationship because of [Michael].  There
> had been an altercation with [Michael].  Certainly I think that his
> contact has been substantial.
>
> He is the one who went to the hospital when [Eric] was
> hospitalized.  He says that the mother has a history of not taking
> her meds.  And we have the history in the case of -- there is a long
> CPS involvement with this -- with this family going all the way back
> to the  -- to [Matt's] birth.

The trial court thus found by clear and convincing evidence that Michael had

knowingly placed or knowingly allowed his children to remain in conditions or

surroundings that endangered the physical or emotional well-being of the

children, that he had engaged in conduct or knowingly placed the children with

17

persons who engaged in conduct that endangered the physical or emotional well-being of the children, and that termination of the parent-child relationship was in the children's best interest. The trial court therefore terminated the parent-child relationship between Michael and Matt, John, and Eric.[13] This appeal followed.

### III. CONSTITUTIONAL CHALLENGES

In his sixth through tenth points, which we will address first, Michael argues that section 263.405 of the Texas Family Code violates his right to due process and equal protection and that the statutory scheme contained in section 263.405 violates the separation of powers provision of the Texas constitution. Because the trial court granted Michael's motion to extend the time for filing his statement of points listing the issues raised on appeal, we need not consider these constitutional challenges. *See In re T.H.*, No. 02-07-00464-CV, 2008 WL 4831374, at *9 (Tex. App.—Fort Worth Nov. 6, 2008, no pet. h.) (mem. op.); *In re O.L.A.*, No. 02-06-00321-CV, 2008 WL 706335,

---

[13] The trial court appointed CPS as managing conservator of all the children, appointed Melisa's parents possessory conservators of Matt and Molly, and found that John and Eric are special needs children who would benefit from remaining in their current placement and possible adoption.

18

at \*8 (Tex. App.—Fort Worth Mar. 13, 2008, no pet.) (mem. op.).[14]   We overrule Michael's sixth through tenth points.

## IV.  BURDEN OF PROOF AND STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the Department seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination

---

[14] We have already ruled that family code section 263.405(i) is void as a violation of the separation of powers provision of the Texas constitution. *See In re D.W.*, 249 S.W.3d 625, 645 (Tex. App.—Fort Worth 2008, pet. denied).

19

proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the Department must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2008); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth

of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (Vernon 2002).

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated section 161.001(1)(D) or (E) and that the termination of the parent's parental rights would be in the best interest of the child.  *C.H.*, 89 S.W.3d at 28.  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## V.  FACTUALLY SUFFICIENT EVIDENCE OF ENDANGERMENT

In his first and second points, Michael argues that the evidence is factually insufficient to establish that he endangered his children.  The Department argues that there is factually sufficient evidence to support the trial court's endangerment findings under subsections (D) and (E) of section 161.001(1) of the family code.

21

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), the Department had to prove that Michael (1) knowingly (2) placed or allowed his children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of Michael's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). However, it is not necessary that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary,

22

courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children. *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). A factfinder may infer from past conduct endangering the well-being of the children that similar conduct will recur if the children are returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 256, *and C.H.*, 89 S.W.3d at 17. Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.*, 121 S.W.3d at 133.

The record contains substantial evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment to the physical or emotional well-being of the children. Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. *See J.T.G.*, 121 S.W.3d at 126.

The record demonstrates that Michael allowed Melisa to parent the children during the day even though he was aware that she did not take her

23

bipolar medications. The record also demonstrates that Michael prevented family, friends, and professionals from seeing Eric and initially denied MedStar permission to take Eric to the hospital. Michael's testimony that he was feeding Eric multiple times in the evenings and that he took a full bottle was contradicted by the medical records, testimony, and photographs that revealed Eric's malnourished body. And medical records showed that John was also suffering from malnourishment.

The record also reveals that there were domestic violence issues between Michael and Melisa, which the children witnessed. The record further reveals that Michael had a criminal history that included a conviction for criminal mischief. And at one point during the case, Matt's service plan stated that he showed signs of possible sexual abuse.

We have carefully reviewed the entire record. Giving due deference to the trial court's findings, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Michael knowingly placed Matt, John, and Eric in conditions and engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25; *J.T.G.*, 121 S.W.3d at 124; *In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.) (holding that evidence was legally and factually sufficient to support

24

endangerment finding when evidence showed that mother and father failed to feed one child adequate nutrition; jury could infer that actual harm to one child meant that the physical and emotional well-being of other children in same house were also jeopardized); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that record contained legally and factually sufficient evidence of both endangerment grounds when, among other things, it showed that mother exposed children to domestic violence and refused to participate in her CPS service plan). Accordingly, we hold that the evidence is factually sufficient to support the trial court's findings on environmental endangerment and course of conduct endangerment. We overrule Michael's first and second points.

## VI. TERMINATION WAS IN THE CHILDREN'S BEST INTEREST

In his third point, Michael argues that the evidence is factually insufficient to support the trial court's finding that termination of his parental rights was in the children's best interest. The Department argues that the evidence is factually sufficient to support the trial court's "best interest" finding.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex.

25

2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Regarding the first factor, the children did not testify at trial. However, the evidence demonstrated that there were very serious concerns about

26

Michael's ability to parent and that the children did not want to leave their foster parents to attend visits with Michael. The record also revealed that the children are attached to and bonded with their foster parents.

Regarding the second factor—the children's present and future physical and emotional needs—Dr. Coffman testified that Eric will need lots of developmental assistance through early childhood and Head Start. Weaver said that Eric is seeing a doctor regularly to relearn how to use the muscles that allow him to swallow and that due to Eric's swallowing problems, his food has to be prepared so that he will not aspirate or choke on what he eats or drinks. John has been diagnosed with reactive attachment disorder, which is a life-long disorder, and he is in therapy with a therapist at the University of North Texas. John was also diagnosed with post-traumatic stress disorder and struggles with attachment issues in that he attaches to inappropriate caregivers, such as people whom he has been with for only fifteen or twenty minutes. Matt is attending Head Start, where he is learning his ABCs.

The environmental endangerment and endangering course of conduct discussion above addressed the third, fourth, and eighth factors—the present and future physical and emotional dangers to the children, as well as Michael's parenting abilities, or lack thereof, and his acts and omissions.

27

Concerning the fifth factor, Michael attempted to better himself by attending parenting classes. However, he did not take advantage of other services that were offered to him.

Regarding the parties' plans for the children—the sixth factor—Michael did not list his plans for the children, though it can be presumed from the filing of his appellate brief that he wanted the children returned to him. Weaver, the ongoing case worker, testified that the Department's plan is for the children to be adopted. Schultz, the CASA worker, testified that all four children should be together, but if they cannot be together, the current groupings should be maintained. Sylvia Andrews, the ad litem for the children, recommended that Melisa's parents be named temporary managing conservators of Molly and Matt and that John and Eric remain in the foster home where they are currently residing.

Regarding the stability of the proposed placement—the seventh factor—the evidence demonstrated that terminating Michael's parental rights would allow CPS to pursue adoptive placements for the children, which would allow them to have the stability lacking in their current situation.

Finally, concerning the ninth factor—any excuse for the parents' acts or omissions—Michael was adamant that he had been feeding Eric and did not accept any blame for the condition in which Eric was found.

28

Giving due consideration to evidence that the factfinder could have reasonably found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Michael's parental rights would be in the children's best interest. *See S.G.S.*, 130 S.W.3d at 239–41 (holding that clear and convincing evidence existed that termination of mother's and father's parental rights was in children's best interest when, among other factors, children suffered severe health problems and significant developmental delays while in their care and parents did not utilize services to maintain a stable living environment); *see also In re J.L.W.*, No. 02-08-00179-CV, 2008 WL 4937970, at *9–10 (Tex. App.—Fort Worth Nov. 20, 2008, no pet. h.) (mem. op.) (holding that evidence was legally and factually sufficient to support trial court's best interest finding when evidence revealed that returning child to mother would risk child's emotional and physical well-being because of couple's past history of domestic abuse and because of mother's inability to care for any of her four children). Accordingly, we hold that the evidence is factually sufficient to support the trial court's best-interest finding. We overrule Michael's third point.

### VII. MOTION FOR CONTINUANCE PROPERLY DENIED

At the beginning of the termination trial on December 17, 2007, the trial court heard Michael's motion for continuance, which he had filed that same day. Michael argued that a continuance was needed because he had a psychiatric evaluation scheduled for December 19. The Department responded by reminding the trial court that there had been a hearing on October 1, 2007, which addressed the issue of Michael's getting a psychiatric evaluation, and that he had failed to comply with the trial court's order giving him thirty days to undergo the evaluation. The trial court thereafter denied Michael's motion for continuance.

In his fourth point, Michael argues that the trial court abused its discretion by denying his motion for continuance, which he sought in order to obtain a psychiatric evaluation to comply with his family reunification plan. The Department responds that the trial court properly overruled Michael's motion for continuance.

We review a trial court's ruling granting or denying a motion for continuance for an abuse of discretion. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002). To determine whether a trial court abused its discretion, we must decide whether it acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary

30

or unreasonable.  *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).  Whether the trial court grants or denies a motion for continuance is within its sound discretion.  *See BMC Software*, 83 S.W.3d at 800; *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *see also In re E.L.T.*, 93 S.W.3d 372, 374 (Tex. App.—Houston [14th Dist.] 2002, no pet.).  The trial court's action in denying a continuance will not be disturbed unless the record discloses a clear abuse of discretion.  *State v. Wood Oil Distrib. Inc.*, 751 S.W.2d 863, 865 (Tex. 1988).

A motion for continuance shall not be granted except for sufficient cause supported by an affidavit, consent of the parties, or by operation of law.  Tex. R. Civ. P. 251.  If appellant provides no record of the evidence presented to the trial court, we must presume that the evidence supports the ruling.  *See Wil-Roye Inv. Co. II v. Wash. Mut. Bank, F.A.*, 142 S.W.3d 393, 401 (Tex. App.—El Paso 2004, no pet.); *In re Guardianship of Berry*, 105 S.W.3d 665, 667 (Tex. App.—Beaumont 2003, no pet.).

Here, the record demonstrates that the trial court's October 1, 2007 order required Michael to "attend, participate in, and follow the recommendations of a psychiatric evaluation."  The trial court further ordered that "the psychiatric evaluation for MICHAEL [F.] be arranged by and paid for by the Department of Family and Protective Services within the next thirty (30) days."  More than

31

thirty days elapsed during which Michael failed to comply with the trial court's order. Although the Department argues in its brief that CPS had previously arranged the required psychiatric exam for Michael on October 1, 2007, and that he missed the appointment, the Department does not point to any place in the record supporting its argument. At the hearing, the Department stated only that Michael had failed to undergo a psychiatric evaluation "in compliance with the Court order within 30 days, which the Department had arranged for him to do." Michael did not dispute this, nor did he put on evidence showing why he had been unable to comply with this provision of his service plan prior to the termination trial. As Michael notes in his brief to this court, "The record, however, is absolutely silent on the reason for the delay in securing the psychiatric evaluation."

Under these facts, we cannot conclude that the trial court abused its discretion by denying Michael's continuance for more time to complete his service plan. *See D.B.*, No. 02-07-00428-CV, 2008 WL 2553343, at *6 (Tex. App.—Fort Worth June 26, 2008, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by denying appellant's motion for continuance when he had four months' notice of trial setting but waited until day of termination trial to file motion for continuance and did not claim that he was unprepared for trial); *see also In re S.W.,* No. 02-08-00164-CV, 2008 WL 4531711, at *3

32

(Tex. App.—Fort Worth Oct. 9, 2008, no pet.) (mem. op.) (holding that when parent chooses to travel out of state and neglect her service plan and then at the time of the termination trial requests a continuance in order to complete the plan, the trial court does not abuse its discretion by denying a continuance).

Moreover, we note that even if Michael had been granted more time to complete his service plan, he cannot demonstrate that the result of the termination trial would have changed because his parental rights were not terminated for failing to complete his service plan but instead were terminated for other statutory reasons. *See generally* Tex. Fam. Code Ann. § 161.001(1)(O) (listing as a separate ground, not linked to endangerment, the failure to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child). For this reason as well, the trial court did not abuse its discretion by denying Michael's motion for continuance. *Cf. In re H.B.*, No. 02-06-00102-CV, 2006 WL 3438193, at *2 n.6 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.) (stating that given counsel for the Department's representation that he was proceeding on "D and E" grounds, not on the added mental health grounds, no abuse of discretion occurred when the trial court denied appellant's motion for continuance).

Furthermore, Michael's written motion failed to comply with rule 251 because it was not supported by verification or affidavit, and the trial court could have properly denied the motion on this ground as well. *See* Tex. R. Civ. P. 251; *In re J.A.*, No. 02-05-00454-CV, 2006 WL 3114434, at *9 (Tex. App.—Fort Worth Nov. 2, 2006, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by denying appellant's motion for continuance because appellant did not comply with rule 251 when he requested a continuance without a supporting affidavit). We therefore overrule Michael's fourth point.

### VIII. PHOTOGRAPHS PROPERLY ADMITTED

In his fifth point, Michael contends that the trial court committed reversible error by admitting exhibits containing photographs for which the proper evidentiary predicate had not been laid. Specifically, Michael contends that the sponsoring witness, through whom the photographs were admitted, failed to address whether the photographs had been altered. The Department responds that the exhibits were properly admitted.

The Department attempted to introduce into evidence exhibits 6 through 15 through Stephanie Nick, a former investigator with the Department. Nick testified that the exhibits contained photographs of Eric that had been taken on February 1, 2007, and that the photographs fairly and accurately portrayed what he looked like when she saw him on February 2, 2007. Michael objected

34

on the basis that the proper predicate had not been established, and the trial court allowed the Department to go back through its predicate again. The Department complied, and Michael reiterated his objection. The trial court sustained Michael's objection. The Department thereafter questioned Nick in more detail:

Q. (BY MS. MILOUD) Ms. Nick, I'm again handing you what's been marked as Petitioner's Exhibits 6 through 15.

A. Uh-huh.

Q. You're familiar with how [Eric] looked on the 2nd day of February 2007; is that correct?

A. Yes, ma'am.

Q. And do these pictures reflect what he looked like on that date to you?

A. Yes, ma'am.

Q. Okay. And they were taken on the 1st, but he looked – he was in this condition when you saw him on the 2nd; is that correct?

A. Yes, ma'am.

Q. Okay. To your knowledge, you have had these pictures in your custody; is that correct?

A. Yes. They have been in my case file.

Q. Okay. And do you know if they have been altered in any way to not clearly, accurately reflect what you saw on that day in the hospital?

A. I don't believe they have been altered, no.

Q. Okay. So this is what he looked like on that date; is that correct?

A. Yes, ma'am.

Q. And you can identify every one, 6 through 15, as the same child and what he looked like on that date?

A. Yes, ma'am.

Michael thereafter took Nick on voir dire and asked whether she was present when the photographs were taken, whether she was present when they were developed, whether she knew the name of the person who took them, and whether she really knew whether they had been altered. At the conclusion of the voir dire, Michael objected again that the proper predicate had not been established and that there was a break in the chain of custody. The Department responded that the chain of custody did not need to be established in a civil suit such as this one and that the rules of evidence do not require that the photographer be called in order to admit the pictures. The trial court overruled the objections and admitted Petitioner's Exhibits 6 through 15. Michael made similar objections when the Department attempted to admit exhibits 16 and 17, which were photographs of Eric on his first birthday. The trial court admitted the photographs over Michael's objections.

36

The admission or exclusion of evidence is left to the trial court's sound discretion. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex. 1995); *Fort Worth Hotel Ltd. P'ship v. Enserch Corp.*, 977 S.W.2d 746, 757 (Tex. App.—Fort Worth 1998, no pet.). "Admissibility of a photograph is conditioned upon its identification by a witness as an accurate portrayal of the facts, and on verification by that witness or a person with knowledge that the photograph is a correct representation of such facts." *Davidson v. Great Nat'l Life Ins. Co.*, 737 S.W.2d 312, 314–15 (Tex. 1987); *see also* Tex. R. Evid. 901(b)(1) (stating that all that is necessary is testimony from a witness with personal knowledge that the photograph accurately depicts what it claims to be). The authentication requirement is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a).

Under the above rules, Nick need not have taken the photographs or observed them being taken in order to testify about them. *See Kessler v. Fanning*, 953 S.W.2d 515, 522 (Tex. App.—Fort Worth 1997, no pet.) (stating that "predicate for admissibility need not be laid by the photographer, the person photographed, or even a person who was present when the photograph was taken"). She testified that the pictures accurately depicted Eric's condition

37

on the date that she saw him.  Her testimony therefore met the requirements of Texas Rule of Evidence 901, and the trial court did not abuse its discretion by admitting the exhibits containing photographs of Eric.  We overrule Michael's fifth point.

## IX. CONCLUSION

Having overruled Michael's ten points, we affirm the trial court's order terminating his parental rights to Matt, John, and Eric.

SUE WALKER
JUSTICE

PANEL: HOLMAN, WALKER, and MCCOY, JJ.

DELIVERED:  December 18, 2008